Dunn v. Dunn.

| 42 | 431 |
| 64 | 750 |

JENNIE E. DUNN et al., appellants,

v.

KEZIAH DUNN, respondent.

1. When two parties occupy to each other a confidential relation, and a sale is made by the party reposing confidence to the party in whom confidence is reposed, equity raises a presumption against the validity of the transaction; to sustain the sale, the buyer must show affirmatively that the transaction was conducted in perfect good faith, without pressure of influence on his part, and with complete knowledge of the circumstances and entire freedom of action on the part of the seller; and when the confidential relation is that of attorney and client, the attorney, who buys, must show that he gave his client, who sells, full information and disinterested advice.

2. When the requisites which equity exacts to sustain such a transaction are not made to appear, it must be adjudged invalid.

3. The owner of a mortgage having sold it to H., her attorney, under circumstances which would have enabled her to avoid the sale, assigned the mortgage to M., who immediately executed an assignment thereof in blank; both assignments were delivered to H., who offered the mortgage for sale and sold to . D., whose name he inserted in the blank assignment, which he delivered; H. was known by D. to have been the attorney of the original owner; the mortgage was a third mortgage, and the encumbrances together equaled if they did not exceed the value of the mortgaged premises; the consideration of the purchase by D. was about half the amount due on the mortgage.— *Held*, that in the absence of notice that the attorney was the purchaser of the mortgage from his client, the title of the purchaser was not affected by the attorney's acts or omissions, and that the circumstances neither gave notice nor put the purchaser on inquiry.

On appeal from a decree advised by Vice-Chancellor Bird, who filed the following conclusions :

This bill is filed for the purpose of having certain assignments of a bond and mortgage owned by the complainant declared void, and to have Mr. Holt charged with the sum of $2,375, received by him to his own profit in the transaction, and also to have the mortgage itself foreclosed.

The complainant's case rests upon the ground of undue influence by her legal advisor and attorney in the transaction, and consequently what is called by some judges a constructive fraud. I think, rather than give many such transactions any harsh name, it is infinitely better to declare it to be against a wise public policy to uphold them, upon which ground may rest their judgments.

The principal facts are not numerous, nor are they disputed. I will first state them, then I will state the law which governs in such cases, and then my conclusions.

In 1874, the complainant became the owner of a bond and mortgage made by Alexander Dunn and William C. Dunn, of Trenton, for $8,000. The principal of the bond was payable in ten years, the interest was payable semi-annually. The mortgage covered their place of business. It was the first lien on one small lot and the third on the two larger lots. The principal of the two mortgages which were prior was $11,000. The $8,000 bond and mortgage now in question, was given in 1872 by said Alexander and William to their brother, who assigned it to the complainant, his wife, in 1874.

When the complainant became the owner of these papers she placed them in the care of Mr. Holt, an attorney and counselor-at-law, with instructions to collect the interest and account to her therefor, less his commissions. Mr. Holt had the benen a member of the bar many years. Between the time of placing these papers in his hands and April, 1877, Mr. Holt loaned to the complainant several sums of money, which he retained out of the interest which he afterwards collected. In April, 1877, Mr. Holt loaned to complainant $500, and took an assignment of the said bond and mortgage as collateral security, although the assignment purports to be for the consideration of the sum of $8,000, and is absolute on its face.

Dunn *v*. Dunn.

The interest came due on the bond October 4th, 1877. Some time prior to that time Alexander and William C. Dunn had failed in business. When Mr. Holt demanded the interest, he was refused payment. Soon afterwards he called on the complainant at her residence in Philadelphia, and informed her of the financial condition of the Dunns. She says that Mr. Holt represented to her that the mortgage was worthless. This he denies and says that she wanted him to make an offer for it. They separated and met again at the office of Mr. Holt, when a paper was drawn by him and signed by her as follows:

"Rec'd of W. D. Holt, Dec. 8, 1877, $100 in cash, which, with $375 to be paid on demand and the amount due said Holt for money by him advanced to me, is in full for a certain bond and mortgage by me owned, which was made by Alexander and Wm. C. Dunn for $8,000, said mortgage having formerly been assigned to said Holt by me, and this makes the said assignment absolute."

About January 14th, 1878, the complainant sent a letter to Mr. E. H. Murphy, one of the defendants, in which she spoke of holding this mortgage, and said: "I fear the property will be sold, and I am unable to protect myself," and added that she had been recommended to place her mortgage in his hands for sale, or otherwise that may be deemed proper, subject to her approval. Mr. Murphy called upon the complainant in Philadelphia very soon afterwerds. The complainant charges that he represented that her mortgage was worthless, and that he offered her $1,200, less the $500 due to Mr. Holt, all of which he emphatically denies in his answer. They parted without effecting anything.

But Mr. Murphy called upon the complainant again, February 2d, 1878, at her residence in Philadelphia. He also denies that in this interview he said to her that the property mortgaged would not sell for enough to pay the former encumbrances, or that her mortgage was worthless, or any such thing. It is worthy of note that he says "that he never made any representation to the complainant whatsoever, at that or at any other time, respecting the number of mortgages encumbering said

28

Dunn v. Dunn.

premises, or their priority, or their value, or the value of the complainant's said mortgage, or the value of the said mortgaged property, or that he ever mentioned to her any circumstance whatsoever affecting the value of her said mortgage, or that he ever used any inducement towards her to part with the same, and that all the knowledge which he ever had, at any time, touching the matters relating to her said mortgage, were disclosed to him by the complainant herself."

I should observe, in passing, that although the complainant called in Mr. Murphy, a third person, and paid him $300 for what he did, clearly, according to his own statement, he was not called in as an independent counsel and adviser, for he gave neither counsel nor advice.

At the first interview between the complainant and Mr. Murphy, she requested him to renew the negotiations with Mr. Holt, and instructed him to obtain more money for the mortgage, and, in case of failure in that, to offer to refund all the money which Mr. Holt had advanced. These facts were communicated to Mr. Holt by Mr. Murphy, when Mr. Holt said if she would pay what she owed him, and the money advanced, he would surrender the mortgage. But the complainant was unable to raise the money necessary to re-imburse Mr. Holt, and requested Mr. Murphy to prevail upon Mr. Holt to give more, which he undertook to do, and secured $900 more for the complainant, which, with what had been advanced, she agreed to accept in full for her mortgage, and to make an assignment of the same.

On February 2d, 1878, at her own residence, in Philadelphia, she executed and acknowledged a deed of assignment of said bond and mortgage to Mr. Murphy, they still being in the possession of Mr. Holt, and he still holding the former assignment. In this assignment to Mr. Murphy, the place for the consideration is blank, so that it nowhere appears upon the paper itself what was given for the assignment. At the same time, Mr. Murphy executed an assignment of the same bond and mortgage, for the consideration of $1, and acknowledged it before the same officer. The place for the name of the assignee was left blank, and it was afterwards filled without the knowledge of Mr. Murphy.

Although Mr. Holt held one assignment directly from the complainant, he declined to take another directly from her, and, consequently, it was agreed between him and Mr. Murphy that the transfer should be made first to Mr. Murphy, and secondly by him to blank, but all should be delivered to Mr. Holt, which was done. At this point Mr. Murphy ceased to act in the matter.

On March 2d, 1878, Mr. Holt procured a paper-writing from the complainant, signed by her, in which, amongst other things, she says that she assigned said mortgage for $1,825, and adds that "the said amount received by me for said mortgage was and is now entirely to my satisfaction; that the transaction was an open and an honorable one in all respects." In effect adding that all her dealings with Mr. Holt respecting said mortgage had been satisfactory, and that she would make affidavit at any time to that end.

About this same time (March 8th, 1878), Mr. Holt sold and assigned the said bond and mortgage to Jennie E. Dunn, the wife of Alexander Dunn, one of the mortgagors, who had become the sole owner of the premises. Jennie E. Dunn held two mortgages on other lands in Trenton, one for $2,000 and one for $2,500. These she called in and paid Mr. Holt $4,200 for the bond and mortgage he got from complainant, being $2,375 in excess of what he paid her, supposing that the highest amount claimed ($1,825) was actually paid her.

The Dunns suspended business about the 1st of October, 1877, but it is very important to observe that they compromised with their creditors at thirty-six cents to the dollar, and resumed business again in December or January next ensuing, before Mr. Murphy had procured the assignment from complainant. I believe that there is no evidence showing that this fact was communicated to the complainant either by Mr. Holt or Mr. Murphy, nor that she was aware of it from any other source. Had the complainant been paid at the rate of thirty-six cents to the dollar, she would have received at least $2,880, over $1,000 more than she actually got. Nothing

appears in the case establishing any reason why she, with her mortgage, should be less favored than any other creditor.

Mr. Holt then was her counselor. For years he had ·her confidence, and the possession of about all her fortune. He had taken from her an absolute assignment of this bond and mortgage, purporting on its face to be for the consideration of $8,000, when only $500 had been advanced upon it, which I refer to, to show how implicitly she trusted him, and only for that purpose, for he never attempted any unworthy use of it. That trust and confidence continued until he broke to her the news of the failure of the Dunns. Not long after this communication he drew, and had her sign the paper first above copied, according to which he was to pay her $975 for the bond and mortgage, the $975 being made up of the $100 in cash, the $375 due on demand, and the $500 note which he held against her. Looking at it in the light of, and as a perfectly fair and honest transaction, it shows that, at that time, Mr. Holt believed the mortgaged premises to be worth only that sum ($975) over and above the two prior mortgages, and that the complainant, having confidence in his judgment, and trusting to him as her counsel, fully believed what was most naturally implied from his offer. Considering their relation to each other (counsel and client), when he said, " I will give you $975 for the mortgage," she had a most perfect right to believe that that, in his opinion, was all it was worth. And this shows where the influence arises, and how it operates, which the law denominates " undue influence." The fatal vice of this influence is that it is unquestioningly received. It is never criticised. It lulls to the profoundest sleep. It closes the door against all inquiry. And most naturally so. Who could reasonably expect anything else? Of all men known to the client, she selects the counsel in whom she has the highest or most unbounded confidence. This being so, why should she not rely upon his statements, whether they be made to her directly or by implication, as in this case, in the offer of only $975 ? And it does not follow that in any such case the act or advice of the counsel may be dishonest or fraudulent—not in the least, for the law does not proceed on such basis at all, since, if the act be

either fraudulent or dishonest, the remedy therefor is abundant, and proceeds on totally different grounds; but, in such cases as the present one is claimed to be, the courts administer relief because of undue influence, that influence which blinds, misleads and prevents all further inquiry, or, if there be inquiry, still under the shadow of the same influence. In other words, public policy sets its face against such things.

The decided preponderance of testimony is that, at the time of the assignment by the complainant, the mortgaged premises were worth from $17,000 to $18,000, being $6,000 over the encumbrances prior to her mortgage. Alexander Dunn, one of the mortgagors, and the husband of Jennie E. Dunn, to whom the mortgage was assigned by Mr. Holt, told his wife that the mortgage "was a good investment." He said "she had mortgages on other properties, and her better plan was to change the mortgages, to prevent anybody from making trouble." The mortgages he referred to were to secure the sum of $4,500. Mrs. Jennie E. Dunn collected the money on these, and paid Mr. Holt $4,200 for the mortgage in question. About the time of the assignment, Alexander Dunn said to Mrs. Furman that the complainant had done a foolish thing in parting with her mortgage, and "that his property was worth all that was on it, and no one would lose a dollar of what was on his property." Mr. Dunn does not deny saying this, but says he don't remember it, and thinks he could not possibly have said it. But I can see no grounds for discrediting Mrs. Furman's statement; and especially may she be believed when it is considered that her statements are corroborated by what Mr. Dunn said to his wife—that is, that it " was a good investment."

What is the law in such cases? In *Condit* v. *Blackwell, 7 C. E. Gr. 481, 485*, the court said: " This fiduciary relation then existing between these parties, the validity of this transaction, must be determined by rules of law which are not applicable to ordinary cases. The confidence which the relation of attorney and client begets between the parties, and the influence which the attorney thereby acquires, has led to a very close scrutiny of all transactions between them, and the law often interposes to set

aside contracts which, between other parties, would be subject to no exception. In such case, the burden of establishing the perfect fairness, adequacy and equity of the negotiation is thrown upon the attorney, and in the absence of such proof, courts of equity treat the case as one of constructive fraud." And again : "The transaction must be characterized by the utmost good faith. There must be no misrepresentation, and an entire absence of concealment or suppression of any fact within the knowledge of the agent which might influence the principal ; and the burden of establishing the perfect fairness of the contract is on the agent."

As I have said above, it is not on the ground of actual fraud that courts interfere, but simply because of the fiduciary relation that is shown to have existed, and it not being made to appear that the transaction, whether a gift or contract, was perfectly fair and just. Weeks, in his work on Attorneys-at-Law, says : "The rule is on the ground of public policy, not of fraud, and prevails although the attorney may be innocent of any intention to deceive, and act in good faith." And again : "Dealings between attorney and client are carefully and jealously regarded, particularly by courts of equity, to protect the client even from his own acts, if done under the influence or supposed ascendency which the attorney may have over him." And again : "As a general rule, the attitude of the attorney towards his client prevents the former from purchasing his client's property, and, at all events, without the most ample information being afforded to the client to place him on his guard." See, also, *Bigelow on Fraud 192, 196, 200, 201; Farmer* v. *Farmer, 12 Stew. Eq. 211; Porter* v. *Woodruff, 9 Stew. Eq. 174; 2 White & T. Lead. Cas. Eq. (4th Am. ed.) 1216 &c.*

Such is the rule in these cases, than which no principle is more universally approved. I must follow it. I think that an application of the undisputed facts to this text sustains the complainant's bill. Mr. Holt, in his answer, says that the transaction was fair, just, honest, honorable and the like. The above-stated rule of law admits that all this may be, and yet the party asking relief at the hands of a court of equity obtain it. A

transaction that would not be questioned, in which one of the parties is not a solicitor, is often set aside when one of them is such solicitor.

Look at the facts in this case. The complainant was indebted to Mr. Holt about $500, showing that she probably was in needy circumstances, which is corroborated by the fact that after he had taken the first assignment, in December, and had learned of her dissatisfaction, and consented to re-assign to her upon payment of the $925, she could not raise that amount of money. Mr. Holt offered her only $925 for a mortgage which was given to secure $8,000. Soon after this offer, and while the negotiations between them were being carried on through Mr. Murphy, the Dunns settled with their unsecured creditors at thirty-six cents to the dollar. That settlement, if it meant anything, meant that this bond would be paid in full; otherwise, an effort would have been made to include it in the settlement. But at the rate of thirty-six cents to the dollar, this bond was worth $2,880, more than $1,000 above what was paid to complainant. Before, or by the 1st of January, 1878, the Dunns had resumed business, and the assignment of the complainant was not procured until February 2d following. Now, it very pre-eminently appears that she was informed of their failure, but I believe it nowhere appears that she was informed or knew of their resumption of business, or that they had agreed to pay thirty-six cents on the dollar to their creditors. The fact of her indebtedness to Mr. Holt, the fact of her destitution, the fact of her ignorance of the true condition of her debtors, and the fact that neither her agent, Mr. Murphy, nor her attorney, Mr. Holt, made these things known to her, are of the utmost importance. It is very difficult to believe that she would have taken $1,825 for an $8,000 mortgage had she been fully apprised of the facts above alluded to. Most clearly the law made it the duty of Mr. Holt to inform her of all these matters before he could contract with her. In my judgment, it is no answer to say that he had ceased to be her attorney. Whatever may have been the true relation afterwards, it is most evident that he was her attorney when, December 8th, 1877, the paper first above copied was signed.

And it must be remembered that by that assignment he became possessed of the absolute legal title, and, to all appearances, had her wholly in his power, which would most naturally influence a female client.

Again, Mr. Holt obtained this mortgage for $1,825, February 2d, 1878, and March 8th, 1878, he assigned it to Mrs. Jennie E. Dunn for $4,200. He thus realized $2,375 on the transaction. This fact cannot but arrest attention. It most unquestionably shows that Mr. Holt did not pay a full and fair price for the mortgage.

I have not overlooked the fact that on the 22d of March, 1878, Mr. Holt procured from the complainant a re-affirmation of her assignment. I do not think this changes the situation in the least. The same undue influence which controlled at the first, in December, or again on February 2d, would control four weeks later. On February 2d, Mr. Holt was willing to accept the $925 and surrender the papers, but she could not raise that amount for him. It is fair to presume that it was still more difficult for her to raise the $1,825 a month later, at which time the new declaration was procured from her.

But the presence of this paper, introduced to prove the high satisfaction of the complainant with the bargain, shows the absolute weakness of the defence. It shows that counsel knew that the transaction was questionable and liable to impeachment. It shows that the purchaser of the mortgage was himself dissatisfied with some of the methods or details pursued. On the face of it this must have been so; otherwise he would have rested on what had already been done. Every view that can be taken of this paper works mightily and effectually against the defence.

Therefore, as against Mr. Holt, I think the complainant should prevail. What as to his assignee, Mrs. Jennie E. Dunn? Does she stand in a more favored position?

Of two views, one at least seems to preclude Mrs. Dunn from successful resistance; that is, that she was not, in any sense, an innocent purchaser. The fullest knowledge must be imputed to her. Mr. Holt had held the mortgage for four years, and had collected the interest thereon falling due from the husband of

Jennie; and her husband was her agent in procuring the assign-
ment of the mortgage from Mr. Holt to her.  Her husband
knew that Mr. Holt was the attorney of the complainant, and
was chargeable with all the means or steps by which Mr. Holt
got the mortgage; and whatever is thus chargeable to the agent
is necessarily extended to the principal.  *Bigelow on Fraud 201.*
. I think Mr. Holt should account to the complainant for the
$2,375, the amount he received from Mrs. Jennie E. Dunn,
above what he paid the complainant, and Mrs. Jennie E. Dunn
must assign the said bond and mortgage to the complainant upon
the complainant paying the $4,200 paid by her to Mr. Holt; and
also any interest that may be due on that much of the mortgage
debt from the mortgagors.   The complainant is entitled to costs.
I will so advise.

*Mr. J. S. Aitkin* and the *Attorney-General,* for W. D. Holt.

*Mr. J. S. Aitkin,* for Jennie E. Dunn and Alexander Dunn.

*Mr. J. F. Harned,* for Keziah Dunn.

The opinion of the court was delivered by

MAGIE, J.

The decree from which these appeals have been taken was
made in a cause wherein Keziah Dunn was complainant and
Jennie E. Dunn and Alexander Dunn, her husband, and Wood-
bury D. Holt, were three of the defendants.

The allegations of complainant's bill, pertinent to the questions
raised here, are substantially these, viz., that complainant was
the owner of a bond made by Alexander and William C. Dunn,
conditioned for the payment of $8,000, with interest, and secured
by a mortgage on several tracts of land in Trenton; that she was
induced to part with the bond and mortgage for the considera-
tion of only $1,225, and to make an assignment thereof, on Feb-
ruary 2d, 1878, to Edward H. Murphy; that Murphy, on the
same day, executed another assignment thereof in blank, which

he delivered to Holt, who immediately sold the bond and mort-
gage to Jennie E. Dunn for a large sum, named as $4,000;
that her name was inserted in Murphy's assignment, which was
delivered to her; that Holt had before been, and was at the time
of this transaction, complainant's agent and attorney, and, as
such, in confidential relations towards complainant; that in the
transaction he had failed in the duty to her which arose from
that relation; that Murphy had received no consideration for
delivering to Holt the blank assignment, but that the whole
transaction was a conspiracy between these parties, with Murphy,
to defraud complainant.

Answers were filed by all the defendants, and the cause was
heard by Vice-Chancellor Bird.

The vice-chancellor concluded that Holt had purchased the
bond and mortgage from complainant, and paid therefor $1,825;
that he had sold the same to Jennie E. Dunn, and received there-
for $4,200; and that he was liable to account to complainant
for the difference, $2,375, with interest, since March 2d, 1878,
the date of the transfer to Jennie E. Dunn. A decree to that
effect was made against Holt.

From so much of the decree Holt appealed.

The vice-chancellor further concluded that Jennie E. Dunn
was chargeable with knowledge of the mode by which Holt had
acquired the bond and mortgage, and so liable to complainant's
equitable claim thereto, and he advised a decree as to her, requir-
ing her to assign the bond and mortgage to complainant on being
paid the amount she had paid for them, $4,200, with interest
from January 1st, 1884.

From this part of the decree Jennie E. Dunn and her husband
(now owner of the mortgaged premises) appealed. Keziah Dunn
also appealed therefrom.

The questions raised by these appeals relate to the propriety
of the decree upon the pleadings and proofs.

Before proceeding to consider the questions presented, it is
proper to state that the decree was not sought below, nor has it
been attempted to be sustained here, on the ground of active
fraud and conspiracy between the parties. When the evidence

was closed below, complainant's counsel disclaimed any intent to ask relief against Murphy, as to whom no other charge had been made. Holt and the Dunns had explicitly denied the charge. It has not been insisted that there is evidence to overcome their denials.

The decree against Holt was obviously grounded upon the fact that the transaction complained of was a purchase of the bond and mortgage by Holt from complainant, while he occupied a relation of a confidential nature towards her.

If such was the fact, the rule applicable to such a transaction has been settled indisputably.

When two parties stand toward each other in any relation which necessarily induces one to put confidence in the other, and gives to the latter the influence which naturally grows out of such confidence, and a sale is made by the former to the latter, equity raises a presumption against the validity of the transaction. To sustain it the buyer must show affirmatively that the transaction was conducted in perfectly good faith, without pressure of influence on his part, with complete knowledge of the situation and circumstances, and of entire freedom of action on the part of the seller. When the confidential relation is that of attorney and client, the attorney, who buys, must also show that he gave to his client, who sells, full information and disinterested advice. In the leading case of *Gibson* v. *Jeyes, 6 Ves. 266*, Lord Eldon said: "The attorney must prove that his diligence to do the best for his vendor has been as great as if he was only an attorney dealing for that vendor with a stranger." Chancellor Walworth said: "The attorney can never sustain a purchase of this kind without showing that he communicated to his clients everything which was necessary to enable them to form a correct judgment of the actual value of the subject of the purchase, and as to the propriety of selling at the price offered, and his neglect to ascertain the true state of the facts himself will not sustain his purchase." *Howell* v. *Ransom, 11 Paige 538.*

Such principles have been applied in our own courts, and notably in *Condit* v. *Blackwell, 7 C. E. Gr. 481; Porter* v. *Woodruff, 9 Stew. Eq. 174,* and *Farmer* v. *Farmer, 12 Stew. Eq. 211.*

Upon Holt's appeal, the first question is whether there existed a confidential relation between Holt and the complainant respecting the bond and mortgage. I think the conclusion reached by the vice-chancellor in this respect was entirely correct. Holt was a well-known attorney, and had held the bond and mortgage in his possession for a long time, collecting the interest for complainant, for which service he was paid a stipulated compensation. He had advanced her $550 and taken her note therefor, with an absolute assignment of the bond and mortgage as security. When the obligors became insolvent, he went to Philadelphia, where complainant lived, and gave her a statement of the situation of affairs. She called on him in Trenton. At these and other interviews she asked for and obtained from him information respecting the lien of her mortgage and its relation to other mortgages on the same premises—facts necessarily affecting the value of her security. The information was such as would naturally be sought from an attorney, and it was imparted by Holt as if in recognition of her right to such service. The whole circumstances clearly indicate that complainant looked on Holt as her adviser, and that he acknowledged her right to do so. I have no doubt at all that a confidential relation did exist, and that it was the relation of attorney and client.

Nor is there anything in the claim urged here that this relation had ceased to exist when Holt made this purchase. When the existence of such a relation has once been established by proof, it will be presumed to continue, unless its cessation is shown. *Kerr on Fraud 153.* The contention is that complainant, by appointing Murphy her agent to sell the bond and mortgage, put an end to the confidential relation with Holt. But this is obviously not to be conceded. The agency of Murphy was not at all inconsistent with the relation of his principal and her attorney, nor could it relieve that attorney from any of his obligations or duties to his client. Where a client had become bankrupt, a purchase by his solicitor from the trustee in bankruptcy has been held to be incapable of enforcement. *Peard* v. *Morton, L. R. (25 Ch. Div.) 394.*

Holt was therefore properly held to have been complainant's

Dunn *v.* Dunn.

attorney at the time he acquired from her the bond and mortgage, and to sustain his purchase he must show the requisites which equity exacts in such transactions. These requisites, as we have seen, are, on his part, perfect good faith, absence of the pressure of the influence acquired by the confidential relation, and the imparting of full information and disinterested advice to the client respecting the transaction—on her part, complete knowledge of the circumstances and entire freedom of action.

We are not required to determine that the attorney actually failed in the performance of these required duties. The invalidity of the transaction will result from a judicial determination that he has failed to show that he performed those duties.

The facts disclosed by the evidence, which are pertinent to this inquiry, are, I think, all included in the following statement: After Holt ascertained the insolvency of the obligors in complainant's bond, he gave her information thereof. She says that he also informed her that her mortgage was subject to two prior mortgages amounting together to about $12,000. In fact, it was a first mortgage on a small triangular piece of land of very small value, except when owned in connection with the other mortgaged premises. This circumstance, it is quite probable, had escaped Holt's recollection, as he says it did. The remainder of the mortgaged premises was covered by two prior mortgages of about $12,000. Holt says that at one of the interviews complainant asked him to purchase her bond and mortgage. She says that he told her that her mortgage was worthless, and offered her for it a small sum in addition to the $550 already advanced her thereon. Whoever most correctly remembers the incidents of these interviews need not be determined, for it is admitted that on December 8th, 1877, Holt took from complainant a paper signed by her, acknowledging the receipt from him of $100, and declaring that sum, with $375 more to be paid her on demand, and the amount due him for money advanced, was " in full " for the bond and mortgage, and these words were added:

" Said mortgage having been formerly assigned to said Holt by me, and this makes the said assignment absolute."

Dunn *v.* Dunn.

Whether Holt gave to his client, from whom he thus purchased this bond and mortgage for about $1,000, any information as to the value of the mortgaged premises, although he has testified as an expert in this case to its value, or any disinterested advice as to the propriety of her selling at the price he offered, has not been made to appear.

This transfer of the bond and mortgage was plainly absolute, yet it is clear that complainant did not so understand it. On January 14th, 1878, she wrote to Murphy, then a broker in Trenton, and stated that she desired to sell her mortgage, because there were $12,000 "ahead" of it, and she feared the property would be sold and she would be unable to protect herself. In consequence of this letter, Murphy visited complainant, and was employed to sell the bond and mortgage. He has not been called as a witness, but it appears that he expressed to Holt complainant's dissatisfaction. Holt thereupon offered to return the bond and mortgage, on being repaid what he had paid or advanced. When this was not accepted, some other arrangement was entered into. It has not been made to appear that Holt gave his client any additional information or advice before this arrangement was concluded. Nor have all the terms of that arrangement been disclosed. It does appear that it was agreed that Holt was to become the owner of the bond and mortgage, but that it was not to be assigned to him. It was in pursuance of this arrangement that it was assigned to Murphy, and by him in blank, and both assignments put in Holt's possession. But what consideration Holt gave for this has not been disclosed. He says it was over $1,500 and less than $2,000. He produces the checks given Murphy for it, but they do not aggregate the smallest sum named by him. Complainant states that she only got $1,225. In the assignment to Murphy, dated February 2d, 1878, and which was acknowledged by her in Philadelphia on the same day, no consideration was inserted. But another assignment has been put in evidence, executed by complainant to Murphy, dated February 1st, 1878, and acknowledged in Trenton February 2d, 1878, in which the consideration is stated to be $1,825. Why these two assignments

Dunn v. Dunn.

were made, or how they came to be acknowledged, one in Phila-delphia and one in Trenton, on the same day, has not been ex-plained. Another paper has been put in evidence, executed by complainant, under date of March 2d, 1878, in which she ac-knowledges the receipt of $1,825. But complainant denies the receipt of so much, and I think it may well be questioned whether, in face of that denial, she ought to have been charged with having received that sum. In *Gresley* v. *Mousely, 3 De G., F. & J. 433,* a purchase by a solicitor from a client having been set aside, and an inquiry directed as to whether the pur-chase-money had been paid, no evidence of payment was ad-duced except the acknowledgment in the body of the deed and the endorsed receipt usual in English conveyances, and it was held that there was not sufficient evidence against parties claim-ing under the client (who was dead), and the purchase-money was treated as not having been paid at all.

Reviewing the transaction as disclosed by the evidence, I have been unable to discover any indication that Holt, in making this purchase from complainant, recognized the confidential relation between them and the duties arising therefrom. If the fact was so, it has not been made to appear. The bargain seems to have differed in no material respect from a bargain between strangers.

This result imparts a peculiar significance to the fact that Holt, within a very short time after he acquired the title to the bond and mortgage, for an undisclosed sum—not greater than $1,825 —sold them for $4,200 cash. It is true that the security was not such that its value could be probably determined with accu-racy. It was a third mortgage, and the encumbrances together equaled or exceeded the value of the mortgaged premises. The weight of the evidence is that the mortgaged premises were worth the encumbrances. But after giving effect to these facts, as tend-ing to make it difficult to determine the value of the mortgage, yet the discrepancy between the price given and the price ob-tained is too great to escape notice. No satisfactory explanation has been given why this security in Holt's hands appreciated in value over one hundred per cent. in one month.

There is no ground for the contention that complainant, in this

transaction, resorted to or relied on independent advice. When that circumstance appears, transactions of this sort may often be sustained, because it shows that *in hac re* the relation of confidence has been superseded and the client deals at arm's length with his attorney. *Korn* v. *Becker, 13 Stew. Eq. 408.* But the fact must be shown, and in this case the proof is wanting.

Nor is there anything effectual in the contention that complainant ratified the transaction. A paper signed by her and dated March 2d, 1878, expressing her satisfaction with it, has been put in evidence. There is some question whether this paper was not executed simultaneously with the assignment. But if executed at its date, it will not be effective as a ratification of the previous transaction, without proof that complainant, at the time of its execution, had obtained a complete knowledge of all the material facts and circumstances affecting the transaction, and rendering it avoidable. *2 Pom. Eq. Jur.* § *964.* There is no such proof. And the paper itself seems not unsusceptible of the interpretation given it by the learned vice-chancellor.

The result is that Holt was rightly held liable to account to complainant for the bond and mortgage. If yet in his possession he would doubtless have been compelled to re-assign them to her. But he had converted them by his sale. Under those circumstances I think he should have been compelled to account for their value. The decree only held him liable to account for what he had acquired by his sale. In this respect, it gave the relief specifically asked in complainant's bill. Whether she would have been entitled to broader relief under the general prayer cannot be considered. No such relief seems to have been contended for. Complainant has not appealed from this part of the decree. We are therefore unable to correct any error—if any there was—in charging complainant in the account with more than she was shown to have received—or in failing to subject Holt to the full extent of his liability.

The decree in this respect should therefore be affirmed.

The decree against Jennie E. Dunn was put on the ground that she was not an innocent purchaser of the bond and mort-

gage, but took them with notice of the steps by which Holt had procured them.

I am unable to follow the vice-chancellor to that conclusion.

No contention has been made that Jennie E. Dunn entered into a conspiracy, designed to procure the bond and mortgage from complainant. I find no evidence that she had any actual knowledge that complainant had been induced to assign the mortgage, until after complainant's assignment and Murphy's assignment in blank had been put into Holt's hands. Then her husband heard that Holt had the security for sale, and advised his wife to buy it. Negotiations were opened with Holt, which resulted in her purchase. She took title by assignment from Murphy, who held complainant's assignment.

To render Jennie E. Dunn liable for the acts or omissions of Holt, it is obvious that it should appear that she had notice of Holt's interest in the bond and mortgage, or that the circumstances were such as to put her on an inquiry, which would have disclosed his interest. I find nothing to indicate that she had actual notice that Holt was the owner of the bond and mortgage. The chain of title shown by the papers did not indicate his interest. On the contrary, they disclosed the title in Murphy. While it is true that she, through her husband, may be charged with notice that Holt had acted as complainant's attorney, yet the fact that Holt, an attorney-at-law, held complainant's assignment to Murphy, and Murphy's assignment in blank, with power to sell, clearly indicated that Holt was then acting, not for complainant, but for Murphy, and I perceive nothing in these circumstances calculated to awaken any suspicion, or evoke any inquiry.

Nor do I think there was anything to awaken inquiry in the fact that she was able to purchase the security for about half its face value. It is evident that its market value must have been less than par, and I find nothing in the evidence to indicate that the price paid, $4,200, was so greatly, if at all, below its real value as to show unfair dealing.

The title acquired by Jennie E. Dunn, through Murphy's assignment, is therefore, in my judgment, unassailable by com-

plainant. She clothed Murphy with complete title to the security in question, and thereby enabled him to dispose of it to Jennie E. Dunn, who purchased it for value, and without notice of the facts which affected the assignment. The assignment was affected, not by the acts or omissions of Murphy, but of a third person, whose interest was undisclosed. Under these circumstances, complainant is estopped from contesting the validity of Murphy's assignment to pass a complete title to Jennie E. Dunn.

The result is that the decree as to Jennie E. Dunn should be reversed, and the bill be dismissed as to her.

This result disposes also of the appeal of Keziah Dunn.

On the appeal of Holt, I shall vote to affirm the decree below, with costs.

On the appeal of Jennie E. Dunn, I shall vote to. reverse the decree below, and for a decree dismissing the bill as to her, with costs.

I shall vote to dismiss the appeal of Keziah Dunn as disposed of by the above votes, with costs.

PARKER, J.

I concur in that part of the opinion just read which reverses so much of the decree as relates to the defendant Jennie E. Dunn; but I dissent from so much as affirms the decree against the defendant Woodbury D. Holt.

In the year 1874, Keziah Dunn, the complainant, became the owner of a mortgage, given by Alexander Dunn and William C. Dunn to Isaac A. Dunn, upon real estate in the city of Trenton, to secure the sum of $8,000. It was a *first* mortgage on a very small part of the premises—a part of little value, and a *third* mortgage on the residue, on which were the buildings, and in which consisted nearly the entire value of the property.

The complainant, who resided in the city of Philadelphia, on coming into possession of the mortgage, requested Mr. Holt to receive from the mortgagors the interest as it accrued, and after deducting the sum of $10 a year for his trouble, to transmit the interest to her. This he did for several years. The interest was paid to him promptly, and he as promptly sent it to the

Dunn *v.* Dunn.

complainant. In October, 1877, the mortgagors defaulted in the payment of interest, and complainant was duly informed of the fact by Mr. Holt.

Mr. Holt was a counselor-at-law, residing in the city of Trenton. He had never been counsel of the complainant, never had given to her advice as a lawyer, and never had received a fee from her as counsel or adviser. The extent of his business relations with complainant, previous to her selling to him the mortgage in question, was, as before stated, *i. e.*, receiving interest moneys and transmitting the same to her. It was a kind of business not necessarily pertaining to his profession and one which any agent, not a lawyer, could have done.

At the time the mortgagors ceased to pay the interest, the complainant was indebted to Mr. Holt in about the sum of $500. This indebtedness was for moneys which, at her urgent request, Mr. Holt had from time to time loaned to her. She had assigned him the mortgage as collateral security for the money he had loaned. The assignment, on its face, was absolute, although both parties understood, and without dispute acted on the understanding, that it was collateral for the loan.

On the 8th day of December, 1877, the complainant, desiring to raise more money, requested Mr. Holt to buy her mortgage, which, after some hesitation, he did. She sold it to him for $975, and gave him a certificate that the assignment he had held as collateral should be and was an absolute assignment of the mortgage.

A few days after this sale, the complainant became dissatisfied with the price for which she had sold the mortgage to Mr. Holt, and without Mr. Holt's knowledge, she consulted Edward T. Green, Esq., a counselor-at-law, residing in the city of Trenton. Mr. Green advised her to go to E. H. Murphy, also a counselor-at-law, as well as a banker and broker in Trenton, a gentleman who was thoroughly conversant with the value of real estate and of mortgage securities in that city. She immediately wrote to Mr. Murphy, stating that she had placed a business matter in the hands of Edward T. Green, counselor-at-law, and that he had advised her to go to him (Murphy) and put the mortgage

in his hands for sale.   Thus the complainant repudiated the sale
of the mortgage she had already voluntarily made to Mr. Holt,
and regarded her absolute assignment to him as of no effect.
From that time she assumed a position adverse and hostile to
Mr. Holt, and if there had ever existed between them the confi-
dential relations of counsel and client (of which there is no
proof), those relations were then severed; their interests were
antagonistic, and Mr. Holt was not in a position to influence the
complainant if he had desired to do so.

In all future transactions, in reference to the mortgage, the
complainant had the benefit of the advice of her counsel, Mr.
Green and Mr. Murphy.   Soon after he received the letter from
complainant, above referred to, Mr. Murphy visited her.   To
him she expressed dissatisfaction with the price at which she had
sold the mortgage, but she did not to him complain of any fraud
or deception on the part of Mr. Holt.   She requested Mr.
Murphy to see Mr. Holt and ask him if he would not pay her
more money for the mortgage, and in the event of his not agree-
ing to do so, then to ask him to re-assign to her the mortgage if
she would repay to him the money he had paid her for it.

Mr. Murphy communicated to Mr. Holt what the complain-
ant had said to him.   How did Mr. Holt act?   He had an abso-
lute assignment of the mortgage.   Did he make an effort to hold
on to it?   Did he show any disposition to prevent complainant
getting more money for the mortgage if she could?   On the con-
trary, he acted with the utmost fairness towards the complainant.
He, without a moment's hesitation, told Mr. Murphy that if the
complainant was dissatisfied with her bargain he would surrender
the mortgage to her, upon her repaying to him the money he
had given her for it.

Mr. Murphy subsequently told the complainant the offer Mr.
Holt had made.   She then said she was not able to raise the
money to repay Mr. Holt, and instructed Mr. Murphy to try to
sell the mortgage for more than Mr. Holt had paid for it, and
out of the moneys he received to pay Mr. Holt the moneys he
had paid her; or if he could not find a purchaser for the mort-
gage, at a greater price than Mr. Holt had given, then to try to

Dunn v. Dunn.

get Mr. Holt to pay her an additional sum for the mortgage. Failing, after days of effort, to sell the mortgage for more than Mr. Holt had given her for it, Mr. Murphy, in carrying out his instructions, applied to Mr. Holt and urged him to pay an additional sum for the mortgage of which he then held the unconditional assignment, and after some urging, Mr. Holt did agree to give, and did give complainant the additional sum of about $900, making in all the sum of $1,875. In consideration of this sum the mortgage again became the absolute property of Mr. Holt, the assignment being through the medium of Mr. Murphy, one of the counsel of complainant and her agent to sell it.

In no part of the transaction can I see any evidence of fraud, or overreaching; or any disposition on the part of Mr. Holt to take advantage of complainant.

It seems to me that he was disposed to give, and did give her opportunity to obtain all she could for the mortgage, by selling it for the highest price possible, after she had assigned it absolutely.

When she found it unsalable, and would not bring more than he had already paid for it, Mr. Holt gave her nearly $1,000 more than he first had agreed to give, or was under any obligation, legal or equitable, to give.

In view of these facts, Mr. Holt surely became the absolute owner of the mortgage, to do with it as he saw fit, after the second sale to him by complainant, under the advice and supervision of her counsel. He had the right to sell it for all he could get.

The decree appealed from obliges Mr. Holt to pay the complainant the sum of $2,325 and interest, being the excess for which he was so fortunate subsequently as to sell his mortgage. On what ground is such a decree based? The opinion of the vice-chancellor shows that it was grounded on the fact that Mr. Holt was a lawyer, and the alleged fiduciary and confidential relations existing between him and the complainant, arising out of the assumption that they stood in the relation of counsel and client. The opinion disavows the existence of fraud, or the slightest imposition on complainant on the part of Mr. Holt.

Now I agree with other members of the court that members

of the legal profession should be held to strict responsibility in transactions with their clients, and that, when deception has been practiced, or any advantage taken of a client, by a member of the bar, he should not reap any profits, but should be made to disgorge. But I have never understood this salutary principle to extend so far as to include a transaction such as has been developed by the evidence in this cause. I think that a lawyer, not counseling or advising a mortgagee in respect to disposing of a mortgage, and doing nothing except, at a prior date, receiving interest on it, and sending the same to the mortgagee, is not prohibited by any rule of law or equity from purchasing the mortgage, at request of the mortgagee, if he shall give more for it than any other person can be found to give, after repeated efforts on behalf of the mortgagee to sell; especially where the mortgagee, in the sale, is acting under the direction and advice of counsel employed to sell the mortgage to the best advantage.

It is said that the price paid by Mr. Holt for the mortgage was inadequate. The testimony shows that at the time complainant sold her mortgage to Mr. Holt, real estate, in the city of Trenton, was very much depressed in value. The witnesses differed as to the value of the property in question at that time, some of them placing it as low as $14,000 or $15,000. But it is not so much the value of the mortgaged premises that is to be considered in this cause as the value of a third mortgage on the premises, with $12,000, besides taxes and interest, as liens ahead of it. Do any of the witnesses say that this mortgage, at the time Mr. Holt bought it, was worth more, or, in the market, would have brought more than Mr. Holt gave for it? Mr. Hancock, the chief witness for complainant, on the question of value, says he thought it was worth more, but, in the same breath, he said that he did not dabble in second or third mortgages; that he would not have advanced, at that time, any money upon a third mortgage on that property with an encumbrance of $12,000, accrued interest and unpaid taxes ahead. He adds that at that time second and third mortgages were not negotiable, but had been just before, but that those who took them came out minus.

Dunn v. Dunn.

Such mortgages as the one in question have no certain value. What such a mortgage is worth is mere. matter of speculation, and depends upon circumstances. It may happen that an advance will be realized, but, in a majority of cases, there will be a loss, if real estate be depressed, and the prior encumbrances amount to one-half the former estimated value of the premises. In nearly every case, about the time of this transaction, where the property was sold under foreclosure proceedings, the second and third mortgages were cut out, if the prior encumbrances were of any considerable amount. Hence it was that Mr. Murphy could not find a purchaser for the mortgage who would give more, or as much for it as Mr. Holt. Mr. Holt would not have been able to dispose of it had it not happened that subsequently Jennie E. Dunn made up her mind to secure the premises as a business stand for her husband, and, being able to raise the money to buy it, and to quiet the prior encumbrancers, she did so.

At the time Mr. Holt purchased the mortgage of complainant, he did not know that Jennie E. Dunn or any other person wanted the property. Had not Mr. Holt been so fortunate as to have found a purchaser in Jennie E. Dunn, and the property had been sold on foreclosure, it is quite certain that he would not have realized any amount over what he had given for the mortgage, but the strong probability is that he would have lost every dollar he had paid for it. The price paid by Mr. Holt to complainant for the mortgage was not, at the time he bought it, inadequate, but at that time, under all the circumstances, was its full value.

It is said that when Mr. Holt purchased the mortgage, the mortgagors had compromised with their creditors, and that Mr. Holt should have communicated that information to complainant. There is no evidence to show that Mr. Holt then knew of the compromise. He swears he did not know of it until afterwards. The complainant was frequently in Trenton, and her counsel resided in that city. They had as good opportunity to know of the compromise as Mr. Holt.

The fact is, that the compromise was not made by the mortgagors, but by the firm of Dunn & Murray with their creditors;

and such compromise did not extend to encumbrances on the real estate.

I think the decree against Mr. Holt is inequitable, and I vote to reverse the decree as to him, as well as to Jennie E. Dunn.

For affirmance—THE CHIEF-JUSTICE, DEPUE, DIXON, KNAPP, MAGIE, SCUDDER, VAN SYCKEL, BROWN, CLEMENT, McGREGOR, WHITAKER—11.

For reversal—PARKER, REED—2.